**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

**DORETHA STEEPLES**

      **Plaintiff,**

**v.**

**BAE SYSTEMS NORFOLK SHIP REPAIR,**
**INC.,**
**a wholly owned subsidiary of BAE Systems,**
**Inc.,**

      **and**

**BAE SYSTEMS SHIP REPAIR, INC.,**
**a wholly owned subsidiary of BAE Systems,**
**Inc.,**

      **Defendants.**

Civil Case No.   **2:21-cv-318**

**COMPLAINT**
and **JURY DEMAND**

## COMPLAINT

For her Complaint, Doretha Steeples, by counsel, states as follows against BAE Systems Norfolk Ship Repair, Inc., a wholly owned subsidiary of BAE Systems, Inc., and BAE Systems Ship Repair, Inc., a wholly owned subsidiary of BAE Systems, Inc. as follows:

## NATURE OF THE CASE

1.     This is an employment discrimination case alleging a racially hostile work environment, retaliation, and constructive discharge, pursuant to 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

## PARTIES AND JURISDICTION

2.     Doretha Steeples is a skilled pipe fitter who has spent a number of years working for BAE Systems Norfolk Ship Repair, Inc. ("BAE Norfolk"), in Norfolk, Virginia. Ms. Steeples is African-American.

3.      BAE Norfolk is a division of BAE Systems Ship Repair Inc. ("BAE Ship Repair") (referred to collectively as "BAE" unless otherwise specified), a wholly owned subsidiary of BAE Systems, Inc. ("BAE Systems"), a global defense, security, and aerospace company headquartered in Falls Church, Virginia, and one of the largest private employers in the Virginia Beach-Norfolk-Newport News, VA-NC metropolitan area.  BAE Ship Repair is headquartered in Norfolk, Virginia, and employs approximately 2,200 people at shipyards it operates in Norfolk, VA, Jacksonville, FL, San Diego, CA, and Honolulu, HI.

4.      Ms. Steeples worked as a pipe fitter at BAE through staffing agency, NSC Staffing. BAE exercised the same control over Ms. Steeples as any pipe fitter working on its payroll. Ms. Steeples had a contractual relationship with BAE within the meaning of 42 USC § 1981, as amended by the Civil Rights Act of 1991.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1343.

6.      Venue is proper in the Eastern District of Virginia, Norfolk Division, pursuant to the general venue provision statute, 28 U.S.C. § 1391, because the conduct complained of herein took place in Norfolk, Virginia.

## BAE Was Aware of Its Racially Hostile Work Environment

7.      The environment at BAE was racially hostile well before Ms. Steeples arrived to work there.

8.      On the first day of Ms. Steeples' employment at BAE in May 2018, she had a run-in with Tracey Corman, a Caucasian permanent BAE employee with the position of "helper." Ms. Corman told Ms. Steeples that she (Steeples) could not use the restroom facility because she was not a permanent employee.

9.      Having worked at the BAE Norfolk facility previously, Ms. Steeples knew that Ms. Corman was mistaken and informed Ms. Corman as much.  However, it soon became clear to Ms. Steeples that Ms. Corman was targeting African-American women who used the BAE bathroom facilities with offensive remarks.

10.      For example, Ms. Corman routinely referred to African-American workers using the bathroom with racially charged, offensive language such as "ghetto-fabulous bitches" and "wratched-nasty hoes."

11.      On numerous occasions while in the restroom facility, Ms. Steeples would overhear Ms. Corman denigrate African-American workers.  Although workers were not permitted to smoke cigarettes in the restroom facility, Ms. Corman regularly did, and while doing so, made such racially derogatory comments.

12.      Ms. Corman used racially offensive language not only in the presence of Ms. Steeples, but also in the presence of other workers.  For example, Romeeka Murphy, former Firewatch Coordinator, overheard Ms. Corman state, "those black bitches are so wratched (nasty) just like a typical n*****."  (Murphy Decl., Exhibit A).

13.      Numerous BAE employees had witnessed Ms. Corman make racially offensive remarks, with some making complaints to management well before Ms. Steeples began working at BAE in May 2018.

14.      In the winter of 2017, Ms. Corman directed the "N" word at co-worker Patrick Thorne at least three times, stating, "I understand why you act like a n*****."  Mr. Thorne expressed his dismay each time she used this and other slurs, telling her that he did not appreciate such language.

15.     In addition, Mr. Thorne made a written complaint to Human Resources. Amanda Olaknowski, an HR representative, indicated that she would investigate his complaint, but never followed up with Mr. Thorne. (Thorne Decl., Exhibit B).

16.     Ms. Corman continued to use the "N" word and other racially offensive language.

17.     In or around late February 2018, Mr. Thorne and co-worker Christopher McInnis were having a conversation with Ms. Corman, at which time Ms. Corman described an argument she was having with her significant other and used the "N" word. Although Mr. McInnis expressed disapproval of her language, Ms. Corman proceeded to use the "N" word again repeatedly in the conversation.

18.     Mr. Thorne complained to HR again.

19.     However, even after Mr. McInnis provided a corroborating witness account of the incident to HR, management did nothing to discipline Ms. Corman, and she continued using racist language around the BAE work area. (Thorne Decl., Exhibit B; McInnis Decl., Exhibit C).

20.     Indeed, exhibiting her ignorance of the law concerning racial harassment in the workplace, Ms. Corman stated that it was her "First Amendment right" to use such language at BAE, despite employees expressly telling her that it was offensive. (McInnis Decl., Exhibit C; Davis Decl., Exhibit D).

21.     It was in this hostile work environment that Ms. Steeples found herself when she came to BAE in May 2018.  Although Ms. Steeples made it known to Ms. Corman that she did not appreciate her using racially offensive language around her, Ms. Corman continued to do just that. Ms. Corman directed such language, including the "N" word, at Ms. Steeples behind her back on numerous occasions, and to her face, in the presence of others. (Davis Decl., Exhibit D).

22.     In or around July of 2018, Ms. Steeples was on break from working on the USS Tortuga and sitting by the dry dock with Ms. Murphy and fellow co-worker Mr. Johnny Davis, when Ms. Corman approached them and stated, "These fucking n****** get on my effin' nerves." (*Id.*).

23.     Despite BAE's knowledge of Ms. Corman's proclivity for racist language, management assigned Ms. Corman to be Ms. Steeples' "helper" in the pipe shop.

## <u>Ms. Steeples Made Numerous Complaints to Management</u>

24.     Ms. Steeples not only explicitly told Ms. Corman that she found her racist language deeply offensive, but also reported Ms. Corman's racist conduct to BAE management.

25.     Soon after Ms. Steeples observed Ms. Corman mouth off at African Americans around the restrooms shortly after she arrived at BAE, she confided to both BAE fire watch supervisor Romeeka Murphy and BAE planner Kina Hughes about Ms. Corman's behavior.

26.     Ms. Steeples told Ms. Murphy that Ms. Corman had directed the "N" word at her, even after Ms. Steeples admonished that she should not use such language.  Ms. Steeples told Ms. Murphy that it was "bad enough hearing Tracy use the 'N' word in her routine conversation every day all day long." (Murphy Decl, Exhibit A).

27.     In addition, prior to working directly with Ms. Hughes, Ms. Steeples approached Ms. Hughes about Ms. Corman, asking, "What's up with her?  If she continues saying these things, someone is going to hurt her."

28.     In or around late August 2018, Ms. Steeples was assigned to work under the supervision of Ms. Hughes in the CONEX box for the pipe shop. Ms. Corman worked alongside Ms. Steeples as her "helper."

29.     Ms. Corman continued to use the "N" word in casual conversation with Ms. Steeples while working together. Ms. Steeples repeatedly told Ms. Corman not to use the "N" word, explaining that she grew up in the Civil Rights era and that the "N" word carried an especially repugnant meaning to African Americans.

30.     But Ms. Corman continued, using the "N" word in conversation while discussing how her boyfriend Ira had engaged in a physical altercation with an African American worker.

31.     Ms. Corman often told Ms. Steeples stories about her boyfriend that depicted him as a very violent individual who was involved in assaults. As a result, Ms. Steeples became fearful that she was in danger because Ms. Corman and her boyfriend might try to harm her.

32.     Ms. Steeples reported the incident of Ms. Corman using the "N" word, along with Ms. Corman's repeated use of the term, to Ms. Hughes. Referring to Ms. Steeples by her shipyard nickname, Ms. Hughes acknowledged the complaint, stating, "Okay, Popeye, I'll take care of it."

33.     As Ms. Corman's racist language around Ms. Steeples continued, Ms. Steeples was not sure if Ms. Hughes had elevated her complaint. So she decided to approach her supervisor, Aaron Brown, about her concerns.  In or around early September 2018, Ms. Steeples went to Mr. Brown's office regarding an issue with her time sheets, and while there, brought up Ms. Corman's racist conduct.  Ms. Steeples asked Mr. Brown if he had heard from Ms. Hughes about her complaint.

34.     When Mr. Brown indicated that he had not, Ms. Steeples repeated to him what she had told Ms. Hughes—that Ms. Corman was repeatedly using racist language, including the "N" word, around her, despite Ms. Steeples expressly telling her to refrain from such offensive speech.

35.     Mr. Brown responded by stating, "Maybe it's the medication she's on. I'm going to talk to her."

36.     Ms. Corman's racist rants continued still. On or around September 9, 2018, Ms. Corman was on break with Ms. Steeples and made a comment about different colored raisins, suggesting that, similar to people, the golden raisins were much better than the black ones.

37.     Shortly thereafter, in another conversation, Ms. Corman used the "N" word while describing a road rage incident that her friend had involved himself in.

38.     Once again, Ms. Steeples admonished Ms. Corman against using such language and went directly to Ms. Hughes to report the incident. Ms. Steeples complained about the ongoing nature of Ms. Corman's harassment, stating, "She's at it again. I'm going to ask Re-Run [shipyard nickname for Mr. Brown] to move me."

39.     Ms. Hughes responded that she could not lose Ms. Steeples, as she was a good worker and familiar with the requirements for the job.  Ms. Hughes stated that she would elevate Ms. Steeples' complaint.

40.     On or around October 23, 2018, Ms. Corman used the "N" word again, saying to Ms. Steeples, "Yo, my n*****."

41.     Ms. Steeples confronted Ms. Corman yet again about her use of the "N" word, stating, "I know you're trying to provoke me so that I lose my job, but it's not going to work."

42.     Ms. Steeples again reported Ms. Corman's harassment to Ms. Hughes.  Ms. Steeples told Ms. Hughes that she "couldn't do this anymore," prompting Ms. Hughes to bring Ms. Steeples into Mr. Brown's office to elevate her complaint.

43.     After hearing the situation from both Ms. Steeples and Ms. Hughes, Mr. Brown asked Ms. Steeples to bring her complaint to the pipe shop foreman, Tony Featherstone.

44.     When Ms. Steeples approached Mr. Featherstone, he indicated that he was not available at that time to hear her complaint.

45.     The racial harassment continued unabated.  On or around November 9, 2018, Ms. Corman was looking over the Facebook page of another BAE employee and, referring to the employee's picture, called the employee "n*****ish."

46.     After reporting the incident to both Ms. Hughes and Mr. Brown, Ms. Steeples went directly to foreman Featherstone.

47.     On this occasion, Mr. Featherstone listened to Ms. Steeples' complaint, meeting with her for approximately ten minutes in his office.  He told her that he would speak to HR about the issue.

48.     Ms. Steeples never heard from HR about her complaint.

49.     Upon information and belief, BAE did not investigate Ms. Steeple's complaint at that time.

**BAE Transferred Ms. Steeples to Night Shift in Retaliation**

50.     On or around November 19, 2018, Ms. Steeples and Ms. Corman reported to work at the normal start time of first shift.

51.     While Ms. Steeples was working in the front of the CONEX box and Ms. Corman in the back of the CONEX box, Ms. Corman stated to Ms. Steeples, "I need to talk to you because you've been acting kind of funky with me."

52.     At this point, fellow employee Vinnie Scott entered the CONEX box and witnessed a heated exchange between Ms. Corman and Ms. Steeples regarding Ms. Corman's racial harassment.

53.     Afterward, Ms. Steeples reported to Ms. Hughes and Mr. Brown that she had a verbal altercation with Ms. Corman, noting that she had known that the situation would inevitably come to a head with no action by management to discipline Ms. Corman.

54.     When Ms. Steeples returned to the CONEX box, Ms. Corman was not there.

55.     Shortly thereafter, Ms. Steeples received a call from Mr. Brown that she was to report to the NSC-VMS office.

56.     Ms. Steeples asked the reason, but Mr. Brown gave no indication.

57.     When Ms. Steeples reported to the NSC-VMS office, the NSC representative asked for her badge but would not tell Ms. Steeples why.

58.     Ms. Steeples at first refused to turn in her badge without receiving an explanation. After returning to her station at the CONEX box, Ms. Steeples ran into Mike Patterson, the union spokesperson for the pipe shop, who, seeing her in distress, told Ms. Steeples that Ms. Corman had complained to HR that Ms. Steeples had physically assaulted her.

59.     On hearing this, Ms. Steeples returned to the NSC-VMS office. When she entered the office, she saw Amanda Olaknowski from BAE's HR there.

60.     Ms. Steeples told the NSC representative that she would return her badge as requested, but also stated that it was wrong for NSC and HR to credit Ms. Corman's account of what had happened because it was not true.

61.     The NSC representative informed Ms. Steeples that she was suspended from working at BAE.

62.     After Ms. Steeples returned her badge, Amanda Olaknowski and an NSC representative pulled Ms. Steeples into a room and interviewed her concerning Ms. Corman's complaint of assault.

63.     The meeting lasted approximately 15 minutes.

64.     On returning home, Ms. Steeples contacted her NSC recruiter Kadeem (last name unknown) to apprise her of the situation.

65.     During the conversation, Kadeem received an email from BAE management stating that Ms. Steeples was cleared of wrongdoing, that she would be paid for the day that she was suspended, and that she was to report to work at her regular shift the next day.

66.     Approximately one week later, during the morning safety meeting, Mr. Featherstone informed everyone that there would be a rotation in the shifts and that some people from first shift would be transferred to second shift (night shift).

67.     Featherstone gave no reason for the transfer other than to say the order came from the main building at BAE (central office).

68.     The new rotation in shifts was unprecedented, as far as Ms. Steeples had known from her years working at BAE.

69.     Days later, Ms. Steeples found out that she was one of the workers selected to transfer from first shift to second shift.

70.     Ms. Steeples immediately complained to Mr. Brown about the change, stating that she had terrible night vision, the commute to her home in Newport News was not suitable for her at night, and that arriving at home in the middle of the night after work was not safe.

71.     Mr. Brown told her that, as a contractor, she would not have much of a say in making her complaint known to management.

72.     Ms. Steeples was distraught after learning that she was being transferred to second shift and left early that day.

73.     When Ms. Steeples reported to work at second shift, she was the only female and was subjected to vulgar talk by other workers at the yard.

74.     Work on second shift was physically more demanding than it was on first shift.

75.     Ms. Steeples could not work in the CONEX box during second shift because there were no lights.

76.     She was left to work on the ships, exposed to airborne pathogens, fumes, and the outside elements.

77.     She complained about being the only female and not having good night vision to her second shift supervisor, Windell Baynard.

78.     Confirming Ms. Steeples' suspicion, Mr. Baynard told her, "You know it's because of what happened between you and Tracy on first shift."

79.     The difficult conditions of the second shift were made worse by the knowledge that BAE effected Ms. Steeples' transfer as a result of her complaints about Ms. Corman.

80.     The retaliatory and otherwise racially hostile environment was too much for Ms. Steeples to bear and she felt compelled to quit.

81.     After a few days of working second shift, Ms. Steeples informed Mr. Baynard that she could no longer work.

82.     She did not return to BAE, and a couple weeks later, sent a resignation message, addressed to Mr. Featherstone, the only management employee who took a statement from her regarding her complaints about Ms. Corman.

**Ms. Steeples Suffered Emotional Distress**

83.     The constant harassment by Ms. Corman at work caused Ms. Steeples great distress.

84.    That distress became much worse when BAE ignored her complaints and later transferred her to second shift.  *See* Murphy Decl., Exhibit A; Summerville Decl., Exhibit E.

85.    The ongoing barrage of racial insults by Ms. Corman began to take a toll on Ms. Steeples.

86.    She became a shell of herself, unsure of her professional worth.

87.    She called her daughter Kenyetta every day and cried about the situation.

88.    Kenyetta observed her mom deteriorate emotionally during this time and resort to drinking regularly to cope with the stress of working so closely with Ms. Corman.

89.    At some point during this period, Ms. Steeples began sleeping in her living room because she knew that Ms. Corman was aware of her home address and was afraid that she or her violent boyfriend might accost her at her house.

90.    Ms. Steeples has not recovered from the emotional trauma she suffered on account of the hostile environment she endured at BAE.

91.    She continues to experience anxiety and to question her professional worth due to BAE's treatment of her.

92.    In July 2020, Patrick Thorne was called into HR by Amanda Olaknowski. Mr. Thorne learned that Ms. Corman complained to HR that Mr. Thorne was "rude as shit" and causing a "hostile work environment," by avoiding her.  In that meeting, union representative Mike Patterson stated that "Tracy has a dirty mouth. I have personally heard her say, 'I hate working with all these n*****s.'" He added, "She is a white woman working at a shipyard. She gets away with anything." (Suppl. Thorne Decl., Exhibit F).

93.    Ms. Corman continues to work at BAE, despite continued complaints concerning her racist language.

## COUNT I:

### HOSTILE WORK ENVIRONMENT
### IN VIOLATION OF 42 U.S.C. § 1981

94.     The allegations set forth in paragraphs 1 through 93, above, are incorporated into this Count by reference.

95.     BAE subjected Plaintiff to a racially hostile work environment in violation of 42 U.S.C. § 1981.  BAE's conduct constituted illegal discrimination based on race and illegal discrimination against Plaintiff in the terms and conditions of her employment.

96.     BAE allowed the hostile environment to exist despite notice.

97.     As a direct, actual and proximate result of the Defendant's race discrimination and racial harassment against them, Plaintiff has suffered significant pecuniary and non-pecuniary damages including loss of benefits, loss of promotion opportunities, loss of back pay, loss of future pay, mental anguish, pain, suffering, humiliation and loss of quality and enjoyment of life.

**WHEREFORE**, Plaintiff Steeples respectfully requests that this Court:

1)     Enter a declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States;

2)     Enter an injunction and order permanently restraining the Defendant from engaging in such unlawful conduct;

3)     Order the Defendant to make Plaintiff whole with appropriate lost earnings, future lost earnings, compensation for loss of future pensions and benefits with pre-judgment and post-judgment interest as applicable;

4)     Order the Defendant to make Plaintiff whole by providing all compensation contemplated under the Civil Rights Act of 1866, 42 U.S.C. § 1981, for non-pecuniary losses including, without limitation, pain, suffering, inconvenience, frustration, loss of quality of life,

humiliation, loss of reputation and mental anguish in amounts to be proved at trial with pre-judgment and post-judgment interest as applicable;

5)     Order the Defendant to pay Plaintiff punitive damages in amounts to be proved at trial with pre-judgment and post-judgment interest as applicable and in amounts sufficient to adequately punish the Defendant for engaging in this conduct and to prevent this conduct in the future;

6)     Order the Defendant to pay Plaintiff's reasonable attorney's fees, expert fees and all costs incurred in bringing and prosecuting this action with pre-judgment and post-judgment interest as applicable; and

7)     Enter an order providing all such other relief as this Court deems appropriate.

## COUNT II:

### RETALIATION
### IN VIOLATION OF 42 U.S.C. § 1981

98.     The allegations set forth in paragraphs 1 through 93, above, are incorporated into this Count by reference.

99.     Plaintiff engaged in protected activity, of which Defendant was aware.

100.    Defendant took materially adverse actions against Plaintiff because of her protected activity, including but not limited to transferring her to a shift that was intolerable to her.

101.    As a consequence of Defendant's actions, Plaintiff suffered significant pecuniary and non-pecuniary damages including loss of benefits, loss of promotion opportunities, loss of back pay, loss of future pay, mental anguish, pain, suffering, humiliation, frustration, loss of reputation and loss of quality and enjoyment of life.

102.    Defendants' actions proximately caused Plaintiff's injuries.

**WHEREFORE**, Plaintiff Steeples respectfully requests that this Court:

1)      Enter a declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States;

2)      Enter an injunction and order permanently restraining the Defendant from engaging in such unlawful conduct;

3)      Order the Defendant to make Plaintiff whole with appropriate lost earnings, future lost earnings, compensation for loss of future pensions and benefits with pre-judgment and post-judgment interest as applicable;

4)      Order the Defendant to make Plaintiff whole by providing all compensation contemplated under the Civil Rights Act of 1866, 42 U.S.C. § 1981, for non-pecuniary losses including, without limitation, pain, suffering, inconvenience, frustration, loss of quality of life, humiliation, loss of reputation and mental anguish in amounts to be proved at trial with pre-judgment and post-judgment interest as applicable;

5)      Order the Defendant to pay Plaintiff punitive damages in amounts to be proved at trial with pre-judgment and post-judgment interest as applicable and in amounts sufficient to adequately punish the Defendant for engaging in this conduct and to prevent this conduct in the future;

6)      Order the Defendant to pay Plaintiff's reasonable attorney's fees, expert fees and all costs incurred in bringing and prosecuting this action with pre-judgment and post-judgment interest as applicable; and

7)      Enter an order providing all such other relief as this Court deems appropriate.

## COUNT III:

## CONSTRUCTIVE DISCHARGE
## IN VIOLATION OF 42 U.S.C. § 1981

103.     The allegations set forth in paragraphs 1 through 93, above, are incorporated into this Count by reference.

104.     The Defendant constructively discharged Plaintiff by making the racially hostile conditions of their employment so intolerable that a reasonable person in Plaintiff's position would be compelled to resign, such that Defendant did in fact cause Plaintiff to resign.

105.     As a direct, actual and proximate result of the Defendant's constructive discharge, Plaintiff has suffered significant pecuniary and non-pecuniary damages including loss of benefits, loss of promotion opportunities, loss of back pay, loss of future pay, mental anguish, pain, suffering, humiliation, frustration, loss of reputation and loss of quality and enjoyment of life.

**WHEREFORE,** Plaintiff Steeples respectfully request that this Court:

1)       Enter a declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States;

2)       Enter an injunction and order permanently restraining the Defendant from engaging in such unlawful conduct;

3)       Order the Defendant to make Plaintiff whole with appropriate lost earnings, future lost earnings, compensation for loss of future pensions and benefits with pre-judgment and post-judgment interest as applicable;

4)       Order the Defendant to make Plaintiff whole by providing all compensation contemplated under the Civil Rights Act of 1866, 42 U.S.C. § 1981, for non-pecuniary losses including, without limitation, pain, suffering, inconvenience, frustration, loss of quality of life,

humiliation, loss of reputation and mental anguish in amounts to be proved at trial with pre-judgment and post-judgment interest as applicable;

5)      Order the Defendant to pay Plaintiff punitive damages in amounts to be proved at trial with pre-judgment and post-judgment interest as applicable and in amounts sufficient to adequately punish the Defendant for engaging in this conduct and to prevent this conduct in the future;

6)      Order the Defendant to pay Plaintiff's reasonable attorney's fees, expert fees and all costs incurred in bringing and prosecuting this action with pre-judgment and post-judgment interest as applicable; and

7)      Enter an order providing all such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff herein requests a jury trial on all matters raised in this Complaint.

Dated: June 4, 2021

Respectfully submitted,

Doretha Steeples

By: */s/ James H. Shoemaker Jr.*
     *Counsel for Plaintiff*

James H. Shoemaker, Jr., VSB No. 33148
Andrew J. Dean VSB No. 88192
**PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.**
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: 757.223.4500
Facsimile: 757.223.4518
jshoemaker@pwhd.com
adean@pwhd.com

Rebecca Houlding
Shilpa Narayan
**FRIEDMAN & HOULDING, LLP.**
1050 Seven Oaks Lane
Mamaroneck, NY 10543
888-369-1119 x11
Fax: 866-731-5553
rebecca@friedmanhoudingllp.com
shilpa@friedmanhoudingllp.com
*Pro Hac Vice Admission Applications To Be Filed*